Garwin Gerstein & Fisher LLP
Bruce E. Gerstein, Esq.
88 Pine Street
New York, NY 10005
(212) 398-0055
bgerstein@garwingerstein.com

*Attorneys for Plaintiff and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

VALUE DRUG COMPANY, on behalf of
themselves and all others similarly situated,

    *Plaintiffs,*

  *vs.*

ALLERGAN PLC (f/k/a ACTAVIS PLC);
ALLERGAN, INC.; ALLERGAN USA,
INC.; ALLERGAN SALES, LLC; WARNER
CHILCOTT LIMITED; WARNER
CHILCOTT (U.S.), LLC; WARNER
CHILCOTT SALES (U.S.), LLC; WARNER
CHILCOTT COMPANY, LLC,

    *Defendants.*

Civil Action No. 16-5103

JURY TRIAL DEMANDED

## COMPLAINT

  Direct purchaser plaintiff, Value Drug Company ("Plaintiff"), on behalf of itself and all

others similarly situated, files this Class Action Complaint and Jury Demand against Defendants

Warner Chilcott Limited; Warner Chilcott (U.S.), LLC; Warner Chilcott Sales (U.S.)

(collectively "Warner Chilcott"); Allergan plc, formerly known as "Actavis plc"; Allergan, Inc.;

Allergan USA, Inc.; Allergan Sales, LLC (collectively "Allergan") (all defendants collectively

"Defendants"). Based on personal knowledge, the investigation of counsel, and information and belief, Plaintiff alleges as follows:

## I.        NATURE OF THE ACTION

1.        This is a civil antitrust action seeking treble damages and other relief for the Defendants' unlawful impairment of competition to drugs in Warner Chilcott's Asacol franchise (Asacol, Asacol HD, and Delzicol). As alleged below, the Defendants, beginning with Warner Chilcott and continuing after the company became part of Allergan (f/k/a Actavis), used an extensive array of anticompetitive acts and practices as part of an overall scheme to improperly maintain and extend its monopoly power with respect to the Asacol franchise, to the detriment of Plaintiff and the class of direct purchasers it seeks to represent, causing them to pay overcharges.

2.        Defendants' anticompetitive scheme centers around Asacol, a 400 mg delayed release mesalamine tablet formulation used to treat multiple forms of ulcerative colitis. Ulcerative colitis is a chronic, potentially debilitating condition affecting nearly 238 for every 100,000 people in the United States. Patients being treated with Asacol for ulcerative colitis typically take it indefinitely, over the course of many years, and possibly for a lifetime. By 2004, it was one of the top 100 selling prescription drugs in the United States and was generating more than $300 million in annual U.S. sales for Proctor & Gamble Pharmaceuticals, Inc. ("Proctor & Gamble"). Warner Chilcott acquired the rights to Asacol in 2009. By 2012, annual sales of Asacol in the United States had grown to more than $570 million. Proctor & Gamble, and later Warner Chilcott, held two patents alleged to cover Asacol during this period, which provided them market exclusivity.

3.        The patents listed in the Orange Book for Asacol expired on July 30, 2013. After that date, Warner Chilcott faced a competitive threat from generic manufacturers, who would be

permitted to price compete with Warner Chilcott by selling a bioequivalent generic Asacol product. As a result of the lower price and state generic substitution laws, Warner Chilcott risked losing almost all of its sales to generic competition once its exclusivity expired.

4.       In the face of the looming threat from generic competition to Asacol, Warner Chilcott engaged in an anticompetitive scheme to drive all Asacol patients to two other products, Asacol HD (800 mg delayed release mesalamine tablet) and Delzicol (400 mg delayed release mesalamine tablet wrapped in a useless capsule). Asacol HD and Delzicol not only had no independent therapeutic benefits for patients; they created additional safety and convenience problems for patients. But because Warner Chilcott listed in the Orange Book patents having a longer remaining term for these drug products and these products were not directly substitutable by generic Asacol, they provided Warner Chilcott with a pretext to illegally continue to benefit from supracompetitive pricing long after competing generic Asacol products would have otherwise entered the market and taken the vast majority of market share away from branded Asacol due to lower pricing.

5.       On October 1, 2013, Actavis acquired Warner Chilcott. In performing due diligence for that acquisition, Actavis knew that Asacol and another financially important Warner Chilcott drug, Loestrin 24 Fe, would soon face the patent cliff, *e.g.*, the expiry of the patent(s) covering a drug followed by generic entry, causing intense price competition and diving brand sales. However, Actavis assured its shareholders and potential investors that the acquisition was sound because Warner Chilcott had embarked on a multifaceted "ever-greening extension strategy" that would successfully protect these drugs from generic competition.

6.       The "ever-greening" strategy consists of three main components, all of which, singularly and together, flagrantly violate the Sherman Antitrust Act:  (1) product hopping; (2)

illegal off-label marketing; and (3) sham patent listing and fraudulent litigation.

7.     **Product Hopping.** Anticipating competition from generic Asacol, Warner Chilcott reformulated Asacol into two products, Asacol HD and Delzicol, in order to prevent pharmacists from automatically substituting generic Asacol for the "new" products. The product modifications provided no therapeutic or other practical benefits of any kind to patients. Delzicol is simply Asacol, in essentially the original tablet form, encased in a meaningless cellulose capsule shell; and Asacol HD is merely Asacol with a change in dosage from 400mg to 800mg.

8.     These modifications were made solely to impair generic competition: Generic formulations of Asacol could not be automatically substituted at the pharmacy for prescriptions written for brand versions of Asacol HD or Delzicol since they are technically different formulations. As Warner Chilcott's Chief Executive explained in a February 2013 investor conference call:

> Generally, the generic company doesn't even get launched because the reference product will be Delzicol. . . . There won't be any Asacol out there. We've seen that happen with Doryx, when the generic company got the product approved and by that time the product had moved on . . . . As the reference product has changed and then moved on to either tablet or new dose form, there really isn't much to be substituted there.[1]

And, contemporaneously with the introduction of Delzicol, just a few months before the Asacol patent was set to expire, Warner Chilcott removed Asacol from the market, so that it was not available for physicians to prescribe or for pharmacies to fill.

---

[1]     *Warner Chilcott Management Discusses Q4 2012 Results - Earnings Call Transcript*, *available at* http://seekingalpha.com/article/1216961-warner-chilcott-management-discusses-q4-2012-results-earnings-call-transcript.

9.      Delzicol's cellulose capsule shell provides no medical or convenience benefits of any kind to patients, and is actually a disadvantage to patients because it is difficult to swallow. In fact, the Delzicol package insert instructs consumers who have difficulty swallowing Delzicol to separate the capsule, *remove the Asacol tablet inside*, and simply *ingest the 400mg Asacol tablet*. Warner Chilcott placed the tablets inside a capsule for the sole purpose of impairing generic competition. First, wrapping the product in a cellulose capsule disabled the automatic substitution of generic Asacol tablets for Delzicol capsules at a pharmacy since a capsule is technically a different formulation than a tablet. Second, in order to attempt to compete with Delzicol, generic manufacturers would have to create their own generic version of Delzicol (*i.e.,* wrap their own generic Asacol tablet in their own meaningless capsule shell), file new applications with the Food and Drug Administration ("FDA") for approval of same, and then come to market in the hopes that Defendants had not made yet another meaningless change to the allegedly improved drug. The same is true as pertains to Asacol HD. Further, as explained below, rolling out Asacol HD and Delzicol gave Warner Chilcott the opportunity to automatically keep would-be generic manufacturers of Delzicol out of the market for a minimum of 30 months after those generic manufacturers filed applications with the FDA to market generic versions of those drugs.

10.     **Illegal Off-Label Marketing.** Asacol HD, one of the two reformulated products to which Warner Chilcott "hopped" its Asacol customers, was not FDA approved for all of Asacol's indications, meaning Warner Chilcott could not market Asacol HD as treating all of the same conditions as Asacol. Asacol was FDA approved for three indications: (a) mildly active ulcerative colitis; (b) moderately active ulcerative colitis; and (c) the maintenance of remission of ulcerative colitis. Asacol HD, on the other hand, was only approved for indication (b),

moderately active ulcerative colitis, which affects fewer than 10% of all Asacol patients. In other words, Asacol HD was not FDA approved for the vast majority of ailments for which Asacol was prescribed.

11.     Notwithstanding the fact that Warner Chilcott withdrew the proposed indication mildly active ulcerative colitis (item "a" above) for Asacol HD and never sought to approval for the maintenance of remission of ulcerative colitis (item "c" above), Warner Chilcott unlawfully promoted Asacol HD to treat both conditions and bribed doctors who had previously prescribed Asacol for patients suffering from these conditions to switch their patients to Asacol HD. In October 2015, Warner Chilcott agreed to plead guilty to felony healthcare fraud (18 U.S.C. § 1347) for unlawfully paying kickbacks to prescribers of Asacol and Asacol HD (among other drugs) between October 2009 and September 2013.

12.     **Sham Patent Listing and Fraudulent Litigation.** Warner Chilcott acquired rights to a patent that claimed a specific formulation for a cellulose capsule, and then listed that patent in the FDA Orange Book for Delzicol. In doing so, Warner Chilcott asserted that the capsule patent covered the Delzicol drug product. But in fact, the capsule patent claims a specific capsule formulation that requires ingredients that Delzicol itself does not contain and the capsule shell provides no therapeutic or other practical value whatsoever. By listing the patent in the Orange Book, Warner Chilcott automatically received up to 30 months of freedom from generic competition when it commenced patent litigation against generic manufacturers based on their alleged infringement of that patent. Warner Chilcott's decision to create a meaningless drug formulation comprised of a meaningless capsule shell, along with the attendant listing of the capsule patent in the Orange Book was improper. Moreover, the infringement lawsuits Warner Chilcott ultimately brought against Delzicol ANDA filers were shams both because they were

based on the sham Orange Book listing and because Warner Chilcott lacked any basis to allege that the generic manufacturers' ANDA products infringed any valid claim of the capsule patent, *i.e.,* that the generic manufacturers' ANDA capsules contained all of the claimed ingredients, including the ones absent from Delzicol capsule itself.

13.     Defendants' anticompetitive schemes ultimately dissuaded generic manufacturers from pursuing the opportunity to market competing generic versions of Asacol. But for Defendants' anticompetitive activities, a generic version of Asacol would have entered the market on or shortly after July 31, 2013. Being automatically substitutable for 100% of the units of branded Asacol, generic competitors would have captured 80-95% of Asacol sales, at a small fraction of the brand price, delivering hundreds of millions of dollars in annual savings to purchasers.

14.     As a direct result of Defendants' anticompetitive conduct, Allergan continues to reap the monopoly profits originally made from its Asacol franchise through the exclusivity it wrongfully transferred and extended from Asacol to Asacol HD and Delzicol. Allergan sold approximately $550 million worth of Asacol HD and Delzicol in 2014—at least eight times more than it would have but for Defendants illegal anticompetitive schemes.

## II.     JURISDICTION AND VENUE

15.     This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover threefold damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class (defined below) resulting from Defendants' unlawful and/or fraudulent impairment of generic competition. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

16.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d). During the Class Periods, Defendants resided, transacted business, were found, or had agents in this district, and a substantial portion of the activity affecting interstate trade and commerce discussed below has been carried out in this district.

17.     During the Class Period, Warner Chilcott and Allergan (f/k/a Actavis) manufactured, sold and shipped Asacol, Asacol HD, and Delzicol in a continuous and uninterrupted flow of interstate commerce. The unlawful and/or fraudulent conduct in which the Defendants engaged had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

18.     During the Class Period each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce, including interstate wires, interstate electromagnetic spectrum, interstate railways, and the U.S. mail, to affect their unlawful and/or fraudulent conduct.

19.     This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in this district – transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their unlawful scheme and conspiracy. Defendants' unlawful and fraudulent conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## III.    PARTIES

20.     Plaintiff Value Drug Company ("Plaintiff") is a corporation organized under the laws of the State of Pennsylvania and is located at 195 Theatre Drive, Duncansville, Pennsylvania 16635.  During the class period, as defined below, Plaintiff purchased branded

Asacol, Asacol HD and Delzicol directly from Warner Chilcott and its successors-in-interest at supracompetitive prices and has thereby been injured.

21.     Defendant Allergan plc ("Allergan") is a public limited company incorporated under the laws of Ireland, with its principal place of business at 1 Grand Canal Square, Docklands, Dublin 2, and Ireland. Allergan maintains a place of business within the United States at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey, 07054. Allergan was known as "Actavis plc" ("Actavis") until June 15, 2015, when it began operating under its current name. Allergan markets branded and generic pharmaceuticals throughout the United States and has commercial operations in the United States and approximately 100 countries around the world. Allergan became a successor in interest to Warner Chilcott plc and Proctor & Gamble Pharmaceuticals Inc. when it acquired Warner Chilcott plc on October 1, 2013.

## IV.     THE PRESCRIPTION DRUG MARKETPLACE AND REGULATORY FRAMEWORK

### A.     The Regulatory Structure for Approval and Substitution of Generic Drugs

22.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").[2] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[3]

23.     When the FDA approves a brand manufacturer's NDA, the manufacturer may list in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the

---

[2]     21 U.S.C. §§ 301-392.
[3]     21 U.S.C. § 355(a), (b).

"Orange Book") any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. The manufacturer must list in the Orange Book within thirty days of issuance any patents issued after the FDA approved the NDA.[4]

24.     The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### B.     The Hatch-Waxman Amendments

25.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed into a patient's blood stream (or operate at another site of action) at the same rate and to the same extent as the brand drug. This establishes that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns

---

[4]     21 U.S.C. §§ 355(b)(1) & (c)(2); 21 C.F.R. § 314.53(b).

generic drugs that are therapeutically equivalent to and are of the same dosage strength and form as their brand counterpart an "AB" rating.

26.     The FDCA and Hatch-Waxman Amendments operate on the proven scientific principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.

27.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of less-expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products by providing them with regulatory marketing exclusivities under certain circumstances.

28.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for brand and generic drugs totaled $21.6 billion; by 2013, total prescription drug revenue had climbed to more than $329.2 billion, with generic drugs accounting for 86% of prescriptions.[5] Generics are now dispensed 95% of the time when a

---

[5]     *See* IMS INSTITUTE FOR HEALTHCARE INFORMATICS, MEDICINE USE AND SHIFTING COSTS OF HEALTHCARE, at 30, 51 (Apr. 2014), *available at* http://www.imshealth.com/cds/imshealth/Global/Content/Corporate/ IMS%20Health%20Institute/Reports/Secure/IIHI_US_Use_of_Meds_for_2013.pdf (last accessed June 6, 2014).

generic form is available.[6]

29.     To obtain FDA approval of an ANDA, a generic drug manufacturer must submit a certification as to any patents listed in the Orange Book by the manufacturer of the particular brand drug, also called the Reference Listed Drug ("RLD"). Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

    i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

    ii.   that the patent for the brand drug has expired (a "Paragraph II certification");

    iii.  that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

    iv.   that the patent for the brand drug is invalid, unenforceable, or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").[7]

30.     If a generic manufacturer files a Paragraph IV certification, it must notify the brand manufacturer, and the brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval to the generic's ANDA until the earlier of (a) the passage of 30 months from the date of receipt of the Paragraph IV notice, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[8]  Until one of those conditions occurs, the FDA

---

[6]     *Id.* at 51.
[7]     21 U.S.C. § 355(j)(2)(A)(vii).
[8]     21 U.S.C. § 355(j)(5)(B)(iii).

may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be eligible for final approval but for the 30 month stay triggered by the Paragraph IV patent litigation.

**C.    First-filer's 180 day exclusivity period**

31.    Generics may be classified as (i) first-filer generics, (ii) later generic filers, and (iii) the brand's own authorized generic.

32.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first generic manufacturer who files an ANDA with a Paragraph IV certification (the "first-filer") a 180 day period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.[9] That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand product are either invalid or not infringed by the generic's product, the FDA cannot approve a later generic company's ANDA until180 days after the date of first commercial marketing of the drug by any first applicant, or until the first-filer exclusivity has been forfeited.

33.    The Supreme Court has recognized that "this 180 day period of exclusivity can prove valuable, possibly worth several hundred million dollars" to the first filer.[10]

34.    A first-filer that informs FDA that it intends to wait until all Orange Book listed patents expire before marketing its product does not get a 180 day exclusivity period. Congress

---

[9]    21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).
[10]    *FTC v. Actavis, Inc.*, 570 U.S. ___, 133 S. Ct. 2223, 2229 (2013).

created this 180 day period to incentivize generic manufacturers to challenge weak or invalid patents, or to invent around such patents by creating non-infringing generics.

### D.    The Competitive Effects of AB-Rated Generic Competition

35.    Generic versions of brand drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generic drugs and their corresponding brand versions is their price. Because generic versions of a corresponding brand drug product are commodities that cannot be differentiated, the primary basis for generic competition is price. On average, generics are around 30% less expensive than their brand counterparts when there is a single generic competitor, and this discount typically increases to 50-80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

36.    Since passage of the Hatch-Waxman Amendments, every state has adopted laws that either require or permit pharmacies to automatically substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician has specifically ordered otherwise). Substitution laws and other institutional features of pharmaceutical distribution create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic equivalent hits the market, the generic quickly captures sales of the corresponding brand drug, often capturing 80% or more of the brand's sales within the first six months. In a recent study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand drug sales and (with multiple generics on the market) prices had dropped

85%.[11]  As a result, competition from generic drugs is viewed by brand drug companies, such as

Warner Chilcott and Allergan, as a grave threat to their profits.

37.     Generic competition enables all members of the proposed Class to: (a) purchase

generic versions of a drug at substantially lower prices; and/or (b) purchase the brand drug at a

reduced price.

38.     Until a generic version of the brand drug enters the market, however, there is no

bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the

brand manufacturer can continue to profitably charge supracompetitive prices. Brand

manufacturers, such as Warner Chilcott, are well aware of generics' rapid erosion of their brand

sales. Brand manufacturers thus seek to extend their monopoly for as long as possible,

sometimes (as here) resorting to illegal means.

39.     Once multiple generic competitors enter the market, the competitive process

accelerates and multiple generic sellers typically compete vigorously with each other over price,

driving prices down toward marginal manufacturing costs.[12]

40.     Soon after generic competition begins, the vast majority of the sales formerly

enjoyed by the brand shift dramatically to generic sellers. A 2011 FTC Study found that generics

captured 80% or more of sales in the first six months.[13]  In the end, total payments to the brand

manufacturer of the drug decline to a small fraction of the amounts paid prior to generic entry.

---

[11]     *See* FTC, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS (Jan. 2010)
("FTC Pay-for-Delay Study), *available at* http://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf
(last accessed May 25, 2016).
[12]     *See, e.g.*, Patricia Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical
Markets?*, J.L. & ECON. (Oct. 2000); Tracy Regan, *Generic Entry and Price Competition in the Prescription Drug
Market--18 Years after the Waxman-Hatch Act* (Univ. of Miami, Dep't of Econ., Working Paper, Feb. 14, 2004); R.
Frank, *The Ongoing Regulation of Generic Drugs*, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).
[13]     FTC 2011 AG Study, at 66-67.

This is so because, "[a]lthough generic drugs are chemically identical to their brand counterparts, they are typically sold at substantial discounts from the brand price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."[14]

41.    Once exclusivity is lost and generic entry occurs – an event sometimes referred to as the "patent cliff" – the brand manufacturer can expect a significant drop in profits, as it is forced to either compete by dramatically lowering prices, or accept dramatically lower sales. The tradeoff of longer exclusivity rights in return for quick and effective generic entry after loss of exclusivity was fundamental to the policies and procedures that Congress established in the Hatch-Waxman Act, and embraced by the states in their generic substitution laws (explained below).

42.    Nevertheless, confronted with an imminent loss of profits at the patent cliff, pharmaceutical companies often seek to stall the impact of generic competition. Some methods by which these companies wrongfully stall generic competition are described below.

### E.    Pharmaceutical Manufacturers Game the Regulatory System to Prevent Generic Competition

#### i.    Product Hopping

44.    The threat of AB-rated generic competition creates a powerful incentive for brand companies to protect their revenue streams. This incentive can prompt brand companies to create innovative new products or new versions of old products that offer real medical benefits to patients. It may also drive brand companies to seek to obstruct generic drug competition by

---

[14]    FDA WEBSITE, GENERIC DRUGS: QUESTIONS AND ANSWERS, *available at* http://www.fda.gov/drugs/resourcesforyou/consumers/questionsanswers/ucm100100.htm (last accessed May 25, 2016).

making changes to existing products that offer patients little or, as here, no clinical advantages whatsoever, but are intended to interfere with the normal brand-to-generic competition contemplated and encouraged by the Hatch-Waxman Act and various state laws.

45.     Such tactics, often referred to as "product switching" or "product hopping," can be an effective, albeit anticompetitive, way to game the regulatory structure that governs the approval and sale of generic drugs, thereby frustrating the efforts of federal and state law designed to promote and facilitate price competition in pharmaceutical markets. As discussed in detail below, a brand company can interfere with the mechanism by which generic drugs compete by making non-therapeutic changes to its branded product, and can effectively prevent generic competition, not because the reformulated product is an improvement over the original version of the product or is preferred by consumers, but simply because it differs in strength, route of administration, or dosage form.

46.     An AB-rating is particularly significant to a generic manufacturer because, under Hatch-Waxman and most state generic substation laws (commonly referred to as Drug Product Selection laws ("DPS laws")), pharmacists may (and in many states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing physician (unless the prescription is denominated "Dispense as Written" or "DAW"). Indeed, both Congress and state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers, and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

47.     DPS laws are a critical element in facilitating lower-cost generic competition. These laws permit effective price competition between branded and generic drugs at the pharmacy. If pharmacists need to contact the physician to ask permission to substitute a generic drug for the chemically-identified brand name drug each time the pharmacist filled a prescription, that would significantly and unnecessarily increase the costs and time required for dispensing generic drugs and impede the use of cheaper generic drugs.

48.     The price competition at the pharmacy that DPS laws facilitate is the primary mechanism by which generic drugs are able to compete and reach the market. Competition at the pharmacy is especially important due to the unique characteristics of pharmaceutical markets. Generic manufacturers take market share away from branded pharmaceuticals by making their generic drugs available at a discount. They do not engage in expensive marketing to physicians and patients as branded drug companies do. Significant marketing expenditures by a generic manufacturer would likely increase the price of that generic and would not necessarily lead to greater sales by the marketer because generic entry commoditizes the market. Thus when there is more than one generic on the market, a generic manufacturer marketing its product to physicians or patients has no way to guarantee that, once the physician is convinced to write a prescription for the generic drug in question, that pharmacist will dispense that manufacturer's product rather than one manufactured by another generic manufacturer.

49.     Because it typically would not make economic sense for a generic manufacturer to market its drug to patients and doctors, the only means by which generic manufacturers obtain sales is through price competition at the pharmacy, made possible through the application of the Hatch-Waxman Act and DPS laws. Indeed, this is fundamental to the existing regulatory framework. For these reasons, among others, the FTC explained in a recent amicus brief that

"[a]s a practical matter, if a generic cannot be substituted at the pharmacy counter, the economically meaningful market for the generic product disappears."[15]

50.     AB-rated generic competition enables purchasers to (a) purchase generic versions of brand-name drugs at substantially lower prices, and/or (b) purchase the brand-name drug at reduced prices. However, until generic manufacturers enter the market with an AB-rated generic product, there is no bioequivalent generic drug which competes with the brand-name drug and therefore, the brand-name manufacturer can continue to charge supra-competitive prices profitably without losing all or a substantial portion of its brand-name sales.

51.     This statutorily mandated process, however, can be anticompetitively manipulated when brand-name drug companies, typically before generic competition starts, introduce another version of an already-existing drug that is, as here, no safer and no more effective than the original version (the "new" version is typically a minor, non-therapeutic reformulation), and switch the market to the "new" version. This is accomplished by using coercive tactics to cause prescriptions to be written for the "new" version rather than the "old" version. The result is that, by the time generic versions of the original brand-name drug reach the market, there are few, if any, prescriptions being written for the original brand version and, because there is some slight clinically insignificant difference between the generic drug and the "new" brand drug (*e.g.*, dosage form or milligram strength), state substitution laws will not allow the pharmacist to substitute the less-expensive generic for the more-expensive brand. Due to the barriers that prevent effective competition between generics and branded drugs at the pharmacy when state

---

[15]     Brief for Federal Trade Commission as Amicus Curiae at 9, *Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*, No. 12-3824 (E.D.Pa. Nov. 21, 2012) [hereinafter "FTC Mylan Amicus Brief"], *available at* http://www.ftc.gov/sites/default/files/documents/amicus_briefs/mylan-pharmaceuticals-inc.et-al.v.warner-chilcott-public-limited-company-et-al./121127doryxamicusbrief.pdf.

generic substitution laws do not act to facilitate substitution, the branded manufacturer will thus avoid the "patent cliff" that the Hatch-Waxman Act seeks to promote.

52.     Successful implementation of a product hopping strategy typically requires that patients be switched prior to generic entry. Accomplishing the switch at this time ensures that the generics, once they enter (if they enter) have no chance to compete for those patients via the DPS laws, their only effective means of competition. As the FTC explained recently: "[i]f the brand manufacturer reformulates its product before a generic receives FDA approval," then the generic manufacturer is unlikely to be able to make significant sales with a generic version of the original branded drug.[16]  Instead, "the generic's only practical option is to go back to the drawing board and reformulate its own product to be bioequivalent to the brand reformulation and thus substitutable at the pharmacy."[17]  Of course, even that strategy will not work if the new formulation is patent protected or if the brand decides to implement yet another reformulation.[18]

53.     Importantly, once a brand manufacturer has successfully achieved a switch to a follow-on product, it can expect that most "switched" patients will not make a second switch back to the generic version of the original product (when the generic is released). There are

---

[16]     FTC Mylan Amicus Brief, p.10.
[17]     *Id*.
[18]     The barriers to entry by a generic drug manufacturer are high. Such companies must first formulate a non-infringing generic version of the brand name drug; conduct bioequivalence studies and other studies needed to support the ANDA; file the ANDA and work with FDA on any issues that arise regarding approval; either challenge relevant patents or wait for them to expire; wait for expiration of any applicable regulatory exclusivities; and invest in manufacturing facilities for the commercialization of the product. It is not economically rational for generic manufacturers to engage in these costly activities until regulatory and patent exclusivity expirations near. This is all the more so when generic companies have already heavily invested in formulating and pursuing FDA approval of a generic version of a brand name drug only to have the brand name manufacturer make a therapeutically meaningless formulation change and switch the market to that new formulation for the anticompetitive purpose of thwarting meaningful competition from the existing generic product. This puts the generic manufacturer in the position of having to scrap its investment in the initial generic version of the drug and re-invest in developing a second generic product equivalent to the next version of the branded counterpart drug, all in the hopes that additional switches will not take place prior to approval and launch of the second generation generic product. *See, generally, Abbott Laboratories v. Teva Pharm. USA, Inc.*, 432 F.Supp.2d 408 (D. Del. 2006). Alternatively, the generic may just abandon pursuit of a competitive product.

several reasons why this is the case, all generally relating to the ineffectiveness and inefficiency of price competition by generics in the absence of the application of generic substitution laws. First, as explained above, generic manufacturers cannot compete via marketing efforts to encourage physicians and patients to switch patients' prescriptions back to a generic version of the original drug: Doing so would undermine the feasibility of selling low cost generic drugs.

54.     Second, absent a specific request from a patient, physicians are unlikely to act on their own to switch the patient back. As explained by the FTC: "The physician – who selects the drug product but does not pay for it – has little incentive to consider price when deciding which drug to prescribe."[19]

55.     Third, while patients are concerned about price, they are frequently unaware that comparable, lower-cost generic drugs are on the market (and as noted, it is unfeasible for generic manufacturers to market to them).

56.     Finally, while insurers may be aware of competing generics and motivated to encourage switching, they face substantial challenges in doing so. Even when they engage in substantial efforts to encourage patients to switch, these efforts are frequently very costly, and may have limited success.

57.      There are various tactics that a branded manufacturer may use to try to encourage physicians and patients to switch to its new follow-on drug prior to generic entry. Commonly, the company will aggressively promote the follow-on drug and stop marketing the original drug. The company will typically advocate to physicians that the new product is superior and should be prescribed instead of the original. At the extreme end of the spectrum, a pharmaceutical

---

[19]     *Id.* at p.6.

company may seek to *force* physicians and patients to make the switch to the new drug. This might be accomplished by announcing that the original product will be discontinued on a specified future date, restricting the distribution and availability of the original drug, or completely removing the original product from the market and leaving patients with no other option but to switch.

58.     For a drug manufacturer seeking to implement a product extension strategy by *compelling* patients to switch drugs, it is especially important that the branded drug manufacturer take action before a generic enters the market. Prior to generic entry, the branded manufacturer controls all drug sales for the original drug and can use the tactics described above effectively to move patients from one of its own drugs to another. But after generic entry, there will be effective price competition between the original branded drug and generic substitutes as a result of the application of generic substitution laws, and most of the patients taking the original drug will likely switch to the generic version. Once that happens, the brand manufacturer still has the opportunity to compete on the merits, that is, to market to patients and physicians to convince them that the new, reformulated drug is worth the extra cost as compared to the generic. But the opportunities available to the brand manufacturer to manipulate prescribing practices become much more limited.

### ii.     Sham Orange Book Listing

59.     The Hatch-Waxman Act and FDA regulations require a sponsor of an NDA to submit to FDA a list of patents claiming the approved drug substance or drug product, or claiming an approved method of using the drug product described in the NDA. Specifically, section 505(b)(l) of the Act requires NDA applicants to file as part of the NDA "the patent number and the expiration date of any patent which claims the drug for which the applicant

submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."[20]

60.     Similarly, the relevant regulations provide that the manufacturer shall list in the Orange Book only a patent "that claims the drug or a method of using the drug that is the subject of the new drug application or amendment or supplement to it," and further provide that "[f]or purposes of this part, such patents consist of drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method-of-use patents…"[21]  The regulations define a "drug product" as "a finished dosage form, for example, tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients."[22]

61.     Brand manufacturers can game the system by listing in the Orange Book patents that do not in fact claim the drug product. Such regulatory gaming is effective in impairing competition because in listing patents and patent information in the Orange Book the FDA merely performs a ministerial act. The FDA relies completely on a brand manufacturer's truthfulness about the nature of the patent because the FDA does not have the resources or authority to verify the manufacturer's patents and patent information for accuracy or trustworthiness.[23]

---

[20]     21 U.S.C. § 355(b)(l).
[21]     21 C.F.R. 314.53(b)(1).
[22]     21 C.F.R. 314.3(b).
[23]     *See, e.g., Abbreviated New Drug Application Regulations: Patent and Exclusivity Provisions*, 59 Fed. Reg. 50338, 50343-45 (Oct. 3, 1994); FDA/CDER response to citizen petition re: Actos and Actoplus met, Docket No. FDA-2009-P-0411-0010 (Mar. 15, 2010), at 9.

62.     Alternatively, a brand manufacturer may fraudulently game the system by creating a sham product (in this case, the preexisting tablet covered in a useless or harmful cellulose shell), that is purportedly covered by a patent it owns or licensed (in this case, U.S. Patent No. 6,649,180), listing the patent purportedly covering the sham product in the Orange Book, and using that sham Orange Book listing as a pretext to bring a fraudulent Hatch-Waxman patent lawsuit against would-be generic manufacturers to wrongfully obtain a 30-month stay of FDA approval of the generic product.

63.     Any person may dispute the accuracy of patent information listed in the Orange Book by notifying the FDA in writing (21 CFR § 314.53(f)). But in response the FDA simply asks the brand manufacturer to verify the information it provided originally and makes no changes in the Orange Book "[u]nless the [brand manufacturer] withdraws or amends" the listing. Again, the FDA does not attempt to verify the accuracy of the patent information that brand manufacturers supply. It simply publishes the supplied information in the Orange Book.

64.     As noted above, important regulatory and competitive consequences flow from the brand manufacturer's listing of a patent in the Orange Book as claiming the drug product. If the brand manufacturer lists a patent as claiming the drug product, an ANDA applicant desiring to market its generic product before the patent expires must file a Paragraph IV certification, certifying that the patent is invalid, unenforceable, or would not be infringed by the generic product.[24] The patentee and/or NDA holder then has the opportunity to obtain an automatic 30-month stay on generic competition by filing a patent infringement lawsuit against the ANDA applicant within 45 days of receiving the Paragraph IV certification. Simply by suing on an

---

[24]     21 U.S.C.  § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4).

Orange-Book-listed patent within 45 days, the brand manufacturer *automatically* prevents the

FDA, *without regard to the merits of the lawsuit,* from granting final approval to the ANDA until

the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the

patent is invalid or not infringed by the generic drug manufacturer's ANDA.

## V.    WARNER CHILCOTT AND ALLERGAN'S ANTICOMPETITIVE SCHEME

### A.    Ulcerative Colitis and Asacol

65.    Ulcerative colitis is a chronic debilitating inflammatory bowel disorder that

typically causes bloody diarrhea, rectal urgency, tenesmus, and abdominal cramping. The

disorder may also affect the skin, eyes, joints or livers of ulcerative colitis sufferers. The

condition is present in 238 out of 100,000 people in the United States. If inflammation persists or

is left untreated, ulcerative colitis increases the risk of colorectal cancers.

66.    Ulcerative colitis is a cyclical disorder, meaning patients are often without

symptoms for periods of time but will then develop another ulcer (i.e. have another "flare"). This

disease cycle requires two modes of treatment, one for acute symptoms and another for long term

maintenance of remission.

67.    The most common treatment for ulcerative colitis is a class of drugs containing

the active ingredient mesalamine. Mesalamine drugs operate topically, meaning they reduce

inflammation upon contact with the inflamed portion of the colon, not from systematic changes

to the body. Mesalamine formulations primarily differ as to where the active ingredient is

released along the gastrointestinal tract. If the mesalamine is released too early, for example, in

the stomach or small intestine, then the active ingredient may not reach the colon and will not

provide relief. If the mesalamine is released too late, much of the ingredient will pass through the

body, again providing no relief.

68.     Proctor & Gamble received approval to market a delayed-release oral tablet containing 400 mg of mesalamine to treat mild to moderately active ulcerative colitis, sold under the brand name Asacol, on January 31, 1992. On August 19, 1997, the drug received an additional FDA indication for the maintenance of the remission of ulcerative colitis.

69.     Asacol was a controlled release-mesalamine formulation that was designed to dissolve in the intestines, not in the stomach. The enteric coating ("enteric" meaning "of the small intestine") allows Asacol tablets to pass through the stomach largely intact and then release active mesalamine directly into the affected areas of the colon.

70.     Proctor & Gamble listed two patents in the FDA's Orange Book for Asacol, U.S. Patent No. 5,541,170 ("the '170 patent") and 5,541,171 ("the '171 patent"). Both patents expired July 30, 2013.

71.     By 2004, Asacol was one of Proctor & Gamble's best selling prescription products. The drug became one of the top 100 selling pharmaceuticals in the United States that year, with sales of approximately $322 million.

**B.      Switch from Asacol to Asacol HD**

72.     Proctor & Gamble knew that when the Orange Book listed patents expired, it would lose most of the enormous profits it was making on Asacol because on July 30, 2013, the date of patent expiry, competitors would begin to sell generic Asacol at lower prices, and would rapidly take over most of the market. Proctor & Gamble responded to this threat to their profits by developing a multi-prong strategy to improperly extend the Asacol monopoly well beyond the period provided by the '170 and '171 patents.

73.     Specifically, on or about October 24, 2004, Proctor & Gamble submitted NDA No. 21-830 for an 800 mg, long-acting mesalamine tablet that was later marketed as "Asacol HD." The FDA approved Asacol HD on May 29, 2008.

74.     However, the FDA approved Asacol HD *only* for the treatment of moderately active ulcerative colitis. Unlike Asacol, Asacol HD was not approved for the treatment of the two other conditions—mildly active ulcerative colitis or maintenance of remission of ulcerative colitis. Proctor & Gamble listed two new patents in the Orange Book for Asacol HD, U.S. Patent Nos. 6,893,662 and 8,580,302 (the "'662 Patent" and the  "'302 Patent"). Both of these will expire on November 15, 2021.

75.     Critical to Proctor & Gamble's maintenance of the Asacol franchise, pharmacists could not automatically substitute prescriptions for Asacol HD with generic Asacol because Asacol HD had a different dosage strength (800mg) than Asacol (400mg). As a result, Proctor & Gamble knew that most, if not all, patients who were prescribed Asacol HD would have to fill their prescriptions with Asacol HD, and pay monopoly prices, even if a generic version of Asacol entered the market after the '170 and '171 patents expired in July 2013.

76.     In the summer of 2009, Proctor & Gamble announced that it would sell its brand pharmaceutical division to Warner Chilcott. Warner Chilcott acquired Proctor & Gamble's interests in Asacol and Asacol HD on October 30, 2009.

77.     When Warner Chilcott acquired Asacol, the drug was an immensely successful product. In 2009, it was the 75th top-selling prescription drug in the United States, with annual sales of $490 million.

78.     At that time, the conventional wisdom was that Asacol had less than four years of immense profitability remaining before July 2013, when the '170 and '171 patents would expire,

and generic competition would begin. But one of Warner Chilcott's principal purposes in acquiring Proctor & Gamble's pharmaceutical division was to acquire Asacol.

79.     Beginning shortly after the 2009 acquisition, Warner Chilcott exerted extraordinary efforts, including independently unlawful actions such as off-label marketing and paying kickbacks to doctors, to switch patients from Asacol to Asacol HD. Warner Chilcott knew that if it switched the Asacol prescription base to Asacol HD before July 2013, those prescriptions would not be switched back to Asacol even if generic versions of that product entered the market at that time.

80.     Warner Chilcott knew that this strategy, which depended on patients staying on a particular formulation for extended periods, would be particularly effective with Asacol patients. Ulcerative colitis is a lifelong condition, and ulcerative colitis patients like to stay on a single drug once they find one that works. Patients prefer not to risk unnecessary symptoms by switching drugs. Warner Chilcott CEO Roger Boissonneault specifically recognized this feature of the Asacol marketplace:

> [W]hen someone is put on Asacol for their ulcerative colitis, it is likely that they put on the product 20 to 30 years old [sic], and they are probably going to be taking that product for the rest of their lives, because it prevents the disease, and every once in a while they get a flare, and then you have to use corticosteroids to bring it back, and they certainly become – I mean it is indeed a great product but it is a product that is used in the long term.[25]

81.     However, Asacol HD was not approved to treat most of the conditions Asacol was indicated for, so Warner Chilcott could not *lawfully* market Asacol HD to the majority of Asacol patients, who suffered from *mildly active ulcerative colitis* or needed the drug for the

---

[25]     *Warner Chilcott CEO Discusses 2012 Guidance* (Transcript), Jan. 27, 2012, *available at* http://seekingalpha.com/article/322720-warner-chilcott-ceo-discusses-2012-guidance-transcript.

*maintenance of remission of ulcerative colitis.* Asacol HD was approved only to treat *moderately active ulcerative colitis*, which afflicted a relatively small portion of the patient-base. Only Asacol was approved to treat all three conditions.

82.     Although it had originally sought FDA approval for Asacol HD as a superior treatment for mildly and moderately active ulcerative colitis, Proctor & Gamble never attempted to obtain FDA approval for Asacol HD as a treatment for the maintenance of remission of ulcerative colitis.

83.     After unfavorable clinical results, Proctor & Gamble withdrew its proposed indication for Asacol HD to treat mildly active ulcerative colitis, and sought approval of Asacol HD from the FDA *only* for moderately active ulcerative colitis. Additionally, Proctor & Gamble abandoned its goal to demonstrate "superiority" of Asacol HD over Asacol and instead sought merely to demonstrate "noninferiority" of Asacol HD compared to Asacol.

84.     After it purchased the Asacol franchise from Proctor & Gamble, Warner Chilcott began to unlawfully promote Asacol HD to treat mildly active ulcerative colitis and maintenance of remission therapy—the bulk of Asacol prescriptions—notwithstanding the legal prohibitions against off label marketing.

85.     In 2010 and 2011, Warner Chilcott began an aggressive marketing campaign to switch all patients from Asacol to Asacol HD. CEO Boissonneault, responding to a question about the ongoing switch campaign made clear that Warner Chilcott did not care a whit about the fact that it was engaging in illegal off-label marketing:

> I think we lost a little bit of focus in the fact that convincing
> clinicians that you shouldn't use the 400 you should be using the
> HD. *The issue is the reason that you use Asacol is not because it's*

*400 milligrams or 800 milligrams.* The fact is that it works
quickly, it's well tolerated and you can virtually take this for a long
period of time.[26]

86.     Later in the same conference call, Boissonneault described how Warner Chilcott

cannibalized the Asacol sales: "If you go back and look at it and we – what happened was we

took some [dermatology sales representatives] and we took some [gastrointestinal sales

representatives] and put them together it was like a simplistic execution: Just move the 400

milligram to the HD."[27]

87.     Warner Chilcott's effort to switch patients to Asacol HD came under legal

scrutiny. In April 2016, Warner Chilcott pled guilty to felony healthcare fraud (18 U.S.C. §

1347) for unlawfully paying kickbacks to prescribers of Asacol and Asacol HD (among other

drugs) between October 2009 and September 2013. Warner Chilcott agreed to pay a criminal

fine of $20.74 million, forfeit $2 million in assets, and settle civil allegations for $102.06 million.

88.     This plea and settlement arose from a March 2011 *qui tam* action in which two

former Warner Chilcott employees (who were former Proctor & Gamble employees) accused the

company, in part, of conducting a widespread off-label marketing campaign to cannibalize

Asacol sales in favor of Asacol HD in violation of federal law.[28]

89.     The *qui tam* plaintiffs alleged that, as part of its effort to cannibalize the Asacol

(400mg) sales before the '170 and '171 patents expired, Warner Chilcott deliberately

misrepresented the clinical evidence supporting Asacol HD. As extensively alleged in the *qui*

---

[26]     *Warner Chilcott PLC's CEO Discusses Q2 2011 Results – Earnings Conference Call* (Transcript), Aug. 5, 2011, *available at* http://seekingalpha.com/article/285263-warner-chilcott-plcs-ceo-discusses-q2-2011-results-earnings-conference-call. (Emphasis added.)
[27]     *Id.*
[28]     Plaintiffs' Third Amended Complaint at 3-4, *United States ex rel. Alexander v. Warner Chilcott PLC, et al.*, No. 11-cv-10545 (D. Mass Aug. 8, 2013), ECF No. 45.

*tam* complaint, it was Warner Chilcott's policy to convince doctors to prescribe Asacol HD for all ulcerative colitis patients, not just those with moderately active ulcerative colitis.[29]

90.     In its felony plea, Warner Chilcott admitted that its sales representatives compensated doctors who prescribed high amounts of Warner Chilcott products with euphemistically named "Medical Education Programs"—upscale dinners where no medical education actually occurred; and "Speaker Roundtables" which were just pretexts to compensate top prescribers with what Warner Chilcott termed "speaking fees." Warner Chilcott also agreed that it had instructed its sales representatives to submit fraudulent prior authorizations, which allowed physicians to prescribe Warner Chilcott products despite insurers' formulary restrictions.

91.     Warner Chilcott also acknowledged that its overall corporate culture was hyper aggressive and reckless during this period. As admitted in the Criminal Information to which it pled guilty, Warner Chilcott preferred to hire young, assertive sales representatives (known as "Type A, crazy") with no experience in medical sales and employed "a personality test designed to highlight candidates who were aggressive and not sensitive to rules" who could then be counted on to uphold the hyper-aggressive "Warner Chilcott way." Warner Chilcott executives referred to those who would not adhere to this culture, many of whom were legacy Proctor & Gamble employees, as "creampuffs."

92.     In addition to charges against Warner Chilcott, in October 2015 the President of its Pharmaceuticals Division from 2009 to 2011, Carl Reichel, was personally indicted for Conspiracy to Violate Anti-Kickback Statutes (18 U.S.C. § 371). The indictment alleges that

---

[29]     *Id.* at 151-158.

Warner Chilcott engaged in hyper-aggressive and fraudulent marketing practices to promote its products, including Asacol HD.

93.     Warner Chilcott's cannibalizing of Asacol sales before expiration of the '170 and '171 patents was remarkably successful, especially given that Asacol HD is not approved for maintenance therapy—which accounts for the bulk of ulcerative colitis prescriptions. In 2010, Asacol HD made up 9% of Warner Chilcott's total Asacol franchise sales (which is an indication of the true size of the "moderately active" segment of the market since it predated the aggressive off-label marketing efforts that led to Warner Chilcott's pleading guilty to criminal conduct). By 2012, as a direct result of Warner Chilcott's sustained off-label marketing campaign and its admitted criminal conduct, Asacol HD sales ballooned to 28% of Warner Chilcott's Asacol franchise.

### C.     Switch from Asacol to Delzicol

94.     However, Warner Chilcott still needed to find a way to retain market exclusivity for the remaining 72% of the franchise, which still belonged to Asacol, and was still directly threatened by the loss of exclusivity that would come once the Orange Book listed patents (i.e., the '170 and '171 patents) expired on July 30, 2013. Warner Chilcott knew that unless it could switch its remaining Asacol patients to a product that it could claim was covered by a longer patent exclusivity period, it stood to lose hundreds of millions of dollars in sales.

95.     Warner Chilcott's answer was Delzicol, a mesalamine product which consisted of the Asacol tablet placed into an unnecessary cellulose capsule shell. Warner Chilcott submitted NDA No. 204412 for its new Delzicol product on July 31, 2012, and obtained FDA approval to sell Delzicol six months later, on February 1, 2013. Thereafter Warner Chilcott removed Asacol from the market.

96.     Warner Chilcott promoted Delzicol to investors and the general public as a significant improvement over Asacol. During an investor call in early 2013, Warner Chilcott's CEO bragged about its ability to innovate: "The approval of Delzicol, our new 400-milligram delayed-release mesalamine product, provides you with tangible evidence of our ability to successfully develop improved versions of our key product."[30]

97.     In reality, the FDA approved Delzicol based on its bioequivalence to Asacol. Warner Chilcott established bioequivalence by submitting a comparative pharmacokinetic study and comparative dissolution studies showing that Delzicol would act similarly to Asacol in the human body. Warner Chilcott did not conduct additional clinical efficacy trials or additional safety trials in support of its Delzicol application.

98.     Warner Chilcott identified only two differences between Asacol and Delzicol in its FDA submissions: (1) Delzicol consists of a cellulose capsule inside of which is placed an Asacol tablet; and (2) rather than using dibutyl phthalate ("DBP") as an inactive coating ingredient, as Asacol did, Delzicol instead uses dibutyl sebacate ("DBS").

99.     Warner Chilcott used the FDA's concern over the safety of DBP as a pretext to formulate Delzicol and switch the market to avoid generic competition, rather than simply reformulating Asacol with DBS instead of DBP.

100.    In 2009, the FDA Division of Gastroenterology and Inborn Errors of Metabolism Products ("DGIEP") requested that several manufacturers of mesalamine products submit plans for the removal of DBP from their products and update labeling over concerns with the safety of

---

[30]     *Warner Chilcott Management Discusses Q4 2012 Results – Earnings Call Transcript*, Feb. 22, 2013, *available at* http://seekingalpha.com/article/1216961-warner-chilcott-management-discusses-q4-2012-results-earnings-call-transcript.

DBP. The manufacturers, including Warner Chilcott's own United Kingdom subsidiary, complied and re-formulated their products to use DBS instead of DBP.[31]

101.    Because there were other mesalamine products on the market at that time that did not contain DBP and there was no substantial human safety information available, the FDA determined that Asacol with DBP could remain on the market with updated warning labels until such time that Warner Chilcott could provide a formulation without DBP.[32]

102.    In 2010, Warner Chilcott began meeting with FDA to discuss reformulating Asacol *and* Asacol HD to remove DBP and replace it with DBS. The FDA's goals were for Warner Chilcott to reformulate the enteric coating to use the inactive ingredient DBS instead of the inactive ingredient DBP and to determine what type of testing was necessary for Warner Chilcott to prove whether the reformulated Asacol and Asacol HD were bioequivalent to the original formulation of Asacol and Asacol HD.

103.    Warner Chilcott seized this opportunity to effectuate a product hop to avoid generic competition for its lucrative Asacol franchise.

104.    At a November, 2010 teleconference with the FDA, it was Warner Chilcott, *not* the FDA, who suggested reformulating Asacol 400-mg to an "alternate dosage form" such as a capsule formulation. Warner Chilcott then asked FDA if the proposed bioequivalence studies that the FDA and Warner Chilcott had been discussing for a reformulated Asacol *tablet* with

---

[31]    *See* Department of Health & Human Services, Pediatric and Maternal Health Staff Maternal Health Team Review of Warner Chilcott's Delzicol, NDA 204412, January 9, 2013 at 2; *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/204412Orig1s000OtherR.pdf, p. 37.
[32]    *See* Summary Review for Regulatory Action for NDA 204412 at 4, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/204412Orig1s000SumR.pdf.

DBS could *also* be adequate to support a new capsule dosage form, *i.e.*, what would become Delzicol.[33] The FDA agreed that it could.

105.     In a June 2012 pre-submission meeting with the FDA, Warner Chilcott asked if the FDA would grant its new Delzicol product expedited review, and FDA declined to make such a commitment, stating that any such determination would come at the time the application was filed.[34]

106.     Realizing it would face generic competition the following July, 2013, and that without expedited approval, Delzicol would not be approved in time to thwart the launch of generic Asacol, on information and belief, Warner Chilcott then told FDA it would cease manufacturing Asacol 400mg and withdraw it from the market upon the approval of Delzicol.

107.     It was this impending removal of Asacol 400mg from the market, *not* safety concerns over DBP alone, which caused the FDA to agree to grant Delzicol expedited approval.[35]

108.     As soon as Delzicol was approved on February 1, 2013, Warner Chilcott immediately ceased manufacture and distribution of Asacol 400 mg, completely destroying any market for a generic version of Asacol.

109.     If Warner Chilcott had merely switched the inactive coating on Asacol from DBP to DBS rather than also placing the Asacol tablet inside a useless capsule, a generic version of Asacol would have been AB-rated to, and substitutable for, prescriptions written for Delzicol.

---

[33]     *See* Memorandum of Meeting Minutes between Warner Chilcott and FDA, November 2, 2010 at 6, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/204412Orig1s000Admincorres.pdf, p. 127.
[34]     *See* Memorandum of Meeting Minutes between Warner Chilcott and FDA, June 13, 2012 at 4, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/204412Orig1s000Admincorres.pdf, p. 111.
[35]     *See* Email from Anissa Davis to Wei Shuang, September 12, 2012, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/204412Orig1s000Admincorres.pdf, p. 99.

Differences in excipients and other inactive ingredients such as DBS and DBP generally do not affect FDA's evaluation of therapeutic equivalence and would not have done so here.

110.     Warner Chilcott therefore included the cellulose capsule in order to destroy generic substitutability (and to provide an improper regulatory predicate for improper patent litigation, discussed in detail below). Unlike a change in inactive ingredients such as DBS and DBP, switching the product from a tablet to a capsule does prevent an AB-rating and thus prevents generic Asacol from being substitutable for the new Delzicol under state pharmacy laws.

111.     Warner Chilcott offered no medical justification for switching to a capsule form in its NDA for Delzicol. Indeed, according to the NDA for Delzicol, "no new safety and or efficacy trials were conducted by the Applicant using the proposed capsule product."

112.     Using the empty capsule to cover the 400mg tablet destroyed generic substitutability, was entirely unnecessary, did not provide any therapeutic benefits to patients, and was actually harmful to patients due to its size.

113.     The switch made by Warner Chilcott from a tablet form to a capsule form (1) made no improvement of any kind in the product; (2) made the product more difficult to use and harmful to the consumers (*i.e.*, patients); and (3) was made solely to impair competition from an AB-rated generic version of the drug. Warner Chilcott marketed the 400mg tablet in the capsule solely in order to further its monopolization scheme:

   a. *First*, the FDA approved Delzicol exclusively on the basis of bioequivalence to Asacol. This eliminates the possibility that the Delzicol capsule made the overall product medically superior to Asacol.

   b. *Second*, the capsule around Delzicol quickly dissolves in stomach acid. Thus, the cellulose capsule provides no protection to the enteric-coated Asacol tablet underneath. Enteric coatings are designed to protect active drug ingredients from stomach acid so these ingredients can be released in the gastrointestinal tract.

Cole et al., *Enteric Coated HPMC Capsules De-signed to Achieve Intestinal Targeting*, 231 INT. J. OF PHARMACEUTICS 83, 83 (2002). Taken together, this means that the capsule surrounding the Delzicol tablet is entirely unnecessary because the enteric coating on the Asacol (400mg) tablet prevents the mesalamine from releasing in the stomach.

    c.   *Third*, Warner Chilcott's stated justification at the time of the change, the need to replace the inactive ingredient DBP, was a mere pretext. In truth, a switch from DBP to DBS did not require using a capsule. Absent the anticompetitive product hopping scheme, Warner Chilcott may or may not have switched from DBP to DBS. In fact, it still markets Asacol HD with DBP in the U.S.[36] Regardless of what it did with DBP or DBS, Warner Chilcott would not have encased the Asacol tablet in a large, costly and unnecessary capsule. Indeed, a Warner Chilcott or Allergan foreign subsidiary successfully removed DBP from its identical mesalamine product in the United Kingdom without adding a cellulose capsule. Upon information and belief, the company did not introduce a capsule product in the United Kingdom, as it did in the United States with Delzicol, because this unnecessary feature would not allow the company to game the UK regulatory system.

114.    Further, the unnecessary Delzicol capsule made the product more difficult to swallow than the original formulation for many patients. In April 2014, the FDA issued an Addendum Clinical Review that summarized patients' difficulties swallowing Delzicol compared to Asacol. The FDA referred to 49 instances in which patients had difficulty swallowing Delzicol compared to 18 reported instances in which patients had difficulty swallowing Asacol or Asacol HD.

115.    Patients' difficulty in swallowing Delzicol capsules prevented the FDA from approving Delzicol for the treatment of ulcerative colitis in those younger than 12-years old. While Warner Chilcott received a pediatric indication for Delzicol for those patients 12 and over based on previous Asacol pediatric studies, the FDA did not allow Warner Chilcott to use these same studies to establish safety and efficacy in children under 12 years old because the Delzicol

---

[36]    *See* http://www.allergan.com/assets/pdf/asacol_pi.

capsule may be too large for this population to swallow. As the FDA indicated, by encapsulating the tablet, the size of the pill swelled by over 50%, growing from 14 mm for the Asacol tablet to 21.7 mm for the Delzicol capsule (although the tablet inside the Delzicol capsule is the same size as the Asacol tablet, as shown in the photograph below).

116.    Shortly after Delzicol's release in the spring of 2013, doctors and patients quickly realized that Delzicol is essentially an Asacol tablet surrounded by an unnecessary capsule.

117.    An Oregon newspaper, The Bend Bulletin, recognized the extreme similarity between the drugs and posted a video on YouTube.com. The video depicts schoolteacher Erin Matlock shaking and then opening a Delzicol capsule, only to find a red tablet that appears identical to "what she was taking before" (meaning Asacol).[37]

118.    Similarly, an ulcerative colitis patient posted the following picture on www.redditt.com under the headline "Opened a Delzicol 'capsule' today because it sounded pretty rattly [sic]. ...why?":[38]



---

[37]    Bend Bulletin, Delzicol: *How new is it?*, https://www.youtube.com/watch?v=eNtahEEygHI. *See also*, *Delzicol Replacing Asacol*, https://www.youtube.com/watch?v=oIUYFg7wGj8.
[38]    http://www.reddit.com/r/pharmacy/comments/1fuhxm/opened_a_delzicol_capsule_today_becaus e_it/.

The picture appears to depict a 400 milligram Asacol tablet removed from the capsule. The tablet inside the Delzicol capsule appears to be a solid red Asacol tablet, with the absence of the black lettered pill imprint as the only difference.

119.    Another ulcerative colitis patient created a thread discussion page entitled "The difference between asacol and delzicol," [*sic*] posting the following photograph:[39]



The Delzicol tablets on the right appear to be identical to the Asacol tablets on the left, except they do not have the pill imprint "0752 DR," which was the imprint on Asacol tablets.[40]

120.    Warner Chilcott attempted to justify this deception under the pretext that it created Delzicol due to safety concerns over DBP, an inactive ingredient in the enteric coating of both Asacol and Asacol HD.

---

[39]    *The difference between asacol and delzicol.*, http://www.reddit.com/r/ CrohnsDisease/comments/1cbvel/the_ difference_between_asacol_and_ delzicol/.
[40]    *See* http://www.drugs.com/imprints/0752-dr-18756.html.

121.    However, as explained *supra*, Warner Chilcott could have merely changed the Asacol coating to DBS and allowed Asacol to remain on the market. Instead, it chose to submit an NDA for a new product, Delzicol, which had the DBS coating but also enclosed the Asacol tablet in a useless capsule. As noted above, however, Warner Chilcott's merely changing the inactive ingredient from DBP to DBS would not have prevented generic Asacol from being substitutable for Delzicol. The only thing that prevented substitutability was Warner Chilcott's switching the form of the product from tablets to the bogus capsules.

122.    Warner Chilcott asserted that the FDA's safety concerns regarding DBP prompted it to create a new product (Delzicol) with a new NDA and to withdraw Asacol from the market. These were lies. First, it still markets Asacol HD with DBP to this day.[41]  Second, the FDA had made clear as early as 1997 that the preferred administrative process for obtaining approval to change inactive ingredients such as DBP was by post-approval supplement to an existing NDA, *not by submission of a new NDA*.[42] This approval process allows manufacturers to make changes to their approved products without submitting a new NDA, and without taking any product off the market. Indeed, no pharmacological or manufacturing concern prevented Warner Chilcott from simply substituting DBS for DBP in Asacol using the SUPAC process rather than filing a new NDA.

123.    Merely changing inactive ingredients through the FDA-recommended SUPAC process, however, would not have been useful to Warner Chilcott in impairing generic

---

[41]     *See* http://www.allergan.com/assets/pdf/asacol_pi.
[42]     *See* Guidance for Industry, SUPAC-MR: Modified Release Solid Oral Dosage Forms (September 1997).

competition. The switch from DBP to DBS through the SUPAC[43] process would not have affected the FDA's evaluation of therapeutic equivalence or its approval of ANDAs for generic Asacol. Branded Asacol, made with DBS instead of DBP, would have remained on the market. Generic Asacol would have been substitutable for the DBP-free branded Asacol, and the FDA would have approved those ANDAs.

124.    As part of its anticompetitive scheme, however, Warner Chilcott rejected the FDA's request to reformulate Asacol to remove DBP from it. Instead, Warner Chilcott left DBP in Asacol in order to create a pretext for removing Asacol from the market. As described in detail above, Warner Chilcott replaced Asacol with Delzicol, which is essentially Asacol made with DBS instead of DBP and enclosed in a capsule.

125.    In short, Warner Chilcott removed DBP from Asacol, put a bogus capsule around it, got it approved with a new NDA, and called it Delzicol. The bogus capsule made generic Asacol non-substitutable with Delzicol even though generic Asacol could have been made without DBP. And Warner Chilcott left DBP in branded Asacol in order to provide a pretext for removing that product from the market.

126.    Orchestrating the removal of Asacol from the market was part of Warner Chilcott's anticompetitive scheme. It is well known in the pharmaceutical industry that a brand manufacturer's product hop will be more successful – that it will cannibalize more of the sales of the original product – if it withdraws the original product from the market. Warner Chilcott thus knew that it could cannibalize the entire market, and thereby significantly impair generic

_____

[43]    *See* Guidance for Industry, SUPAC-MR: Modified Release Solid Oral Dosage Forms (September 1997). This FDA Guidance provides recommendations to pharmaceutical sponsors of NDAs, ANDAs, and AADAs who intend to change, among other things, the components or composition or the manufacturing process of a modified release solid oral dosage form during the post approval period.

competition, by withdrawing Asacol from the market rather than by merely removing DBP from Asacol as the FDA had requested.

127.    Warner Chilcott launched Delzicol in March 2013, before the FDA approved any ANDAs for generic Asacol. At around the same time, Warner Chilcott stopped marketing Asacol, and removed it from the market, making it unavailable for purchase. As noted in detail above, it is well known in the industry that, where a brand manufacturer successfully converts the market before the generics enter the market, the generics will make few or no sales.

128.    But for the anticompetitive scheme, Warner Chilcott would not have put a bogus capsule around the tablet, and would not have filed a new NDA. Instead, Warner Chilcott would have simply continued to market Asacol containing DBP with the updated warning label, without the added capsule, as it continues to do with Asacol HD, because the capsule added no therapeutic benefit to the tablet drug product that it needlessly covered. Alternatively, Warner Chilcott would have swapped DBP for DBS in a non-pretextual way -- it would have followed the FDA guidance, which specifically recommended making such a change in plasticizer via a post-approval supplement rather than a new NDA.

129.    Warner Chilcott's CEO recognized, and celebrated, the anticompetitive effects of the unlawful scheme. Responding to a question during an investor call, Mr. Boissonneault stated:

> I think, Chris, historically, we've seen those sorts of things happen. **Generally, the generic company doesn't even get launched because the reference product will be Delzicol. There won't be any Asacol out there.** We've seen that happen with Doryx when the generic company got the product approved and by that time, the product had moved on to, say, to 150 or different, had moved on to a tablet because there really isn't that much business. . . . . And basically, as **the reference product has changed** and then

moved on to either tablet or new dose form, there really isn't much
to be substituted there.[44]

130.    In short, Warner Chilcott knew that if it switched the market before generic entry

in July 2013, a generic version would likely never come to market. And even if a generic version

did come to market, the prescription base would have been completely eliminated, thus depriving

the generic of its only cost-efficient means of competing for sales.

131.    In fact, Warner Chilcott's unlawful scheme caused all of the generic

manufacturers who had filed ANDAs for a generic version of Asacol to abandon their ANDAs

for that product:

    a.    In September 2007, Roxane Laboratories, Inc. ("Roxane") filed an ANDA
        containing a Paragraph IV certification for a generic version of Asacol and sent
        Proctor & Gamble a letter giving notice of said Paragraph IV ANDA to produce
        generic Asacol. This filing demonstrated an ability and willingness by Roxane to
        come to market with a generic version of Asacol no later than upon patent expiry
        in July 2013, if not sooner. The ensuing litigation disclosed that Roxane had
        already made substantial investments in the development of a generic version of
        Asacol. In December 2011, pursuant to stipulation and order of dismissal, Roxane
        informed the court that it no longer intended to pursue a generic version of Asacol
        before patent expiration in July 2013.

    b.    On or about June 22, 2010, Par Pharmaceutical, Inc. ("Par") and EMET
        Pharmaceuticals, LLC ("EMET") submitted ANDA No. 200-730 containing a
        Paragraph IV certification for a generic version of Asacol. In connection with this
        application, Par sent Warner Chilcott a "Notice of Paragraph IV Certification"
        letter saying it intended to challenge the validity or applicability of Asacol's
        existing patents. This filing demonstrated an ability and willingness by Par to
        come to market with a generic version of Asacol no later than upon patent expiry
        in July 2013, if not sooner. On August 9, 2012, Par Pharmaceuticals and EMET
        Pharmaceuticals announced that they intended to market a generic version of
        Asacol upon patent expiration. Upon information and belief, Par and EMET were
        not aware that Warner Chilcott intended to eliminate the market for Asacol
        shortly before they could launch their generic version of the product.

---

[44]    *Warner Chilcott Management Discusses Q4 2012 Results – Earnings Call Transcript*, Feb. 22, 2013,
*available at* http://seekingalpha.com/article/1216961-warner-chilcott-management-discusses-q4-2012-results-
earnings-call-transcript (emphasis added).

c.   In September 2011, Zydus Pharmaceuticals USA, Inc. submitted a Paragraph III certification for a generic version of Asacol. This filing demonstrated an ability and willingness by Zydus to come to market with a generic version of Asacol no later than upon patent expiry in July 2013.

132.   Each of these manufacturers was developing and seeking regulatory approval for a generic version of Asacol. Absent Warner Chilcott's anticompetitive scheme, at least one of these manufacturers, or others, would have introduced a generic Asacol shortly after patent expiration in July 2013.

133.   Generic manufacturers were well aware of the anticompetitive effects that a product hop away from Asacol would have on their ability to use automatic substitution to compete in a cost-efficient manner, as described above. And since Warner Chilcott launched Delzicol on February 1, 2013, and had for years been engaging in the criminal promotion of Asacol HD for all Asacol indications, the generic manufacturers knew by February 1, 2013, at the latest, that there would be virtually no market left for generic versions of Asacol by the time the patents expired in July 2013.

134.   For example, in one product hop that is notorious in the industry (and which preceded the Asacol product hop), before the generics could enter the market the manufacturer of branded TriCor hopped from Formulation #1 of the drug to Formulation #2. A generic manufacturer nevertheless persevered and received FDA approval for a generic version of Formulation #1, but then garnered less than 5% of the unit sales, with 95% of the units remaining with the reformulated brand Formulation #2 for which the generic product was not substitutable. When the generic manufacturer then filed an ANDA for a generic version of Formulation #2, the brand manufacturer hopped to yet another reformulation, Formulation #3. Informed by its prior experience, the generic manufacturer then abandoned its quest for approval of a generic version

of Formulation #2. The generic manufacturers that abandoned their ANDAs here were likewise informed by the TriCor experience and others like it. The unlawful product hop caused them to stop their quest for FDA approval of generic Asacol.

135.    As a direct result of Warner Chilcott's anticompetitive conduct, all generic competitors ceased efforts prior to July 2013 to obtain FDA approval for generic Asacol. But for Warner Chilcott's anticompetitive conduct, one or more of these generic competitors would not have abandoned their efforts to obtain FDA approval of their generic versions of Asacol, and would have succeeded in obtaining such approval and entering the market not later than July 31, 2013.

136.    It is a rarity in the pharmaceutical industry that a prescription drug product that ranks in or near the top 100 in annual U.S. sales revenues (as Asacol would have but-for the anticompetitive hops to the HD and Delzicol products) does not encounter generic competition immediately upon the loss of all applicable patent and regulatory exclusivity. This is due at least in part to the fact that after patent expiry, the generic manufacturers are free to utilize any previously patented process in the development of their equivalent products.

137.    The absence of generic competition for Asacol after patent expiry was the result of the shifting of the market from Asacol to Asacol HD and Delzicol, rather than any post-expiry developmental challenges that Asacol presented. Indeed, Teva, the world's largest generic drug manufacturer, maintains that it was capable of launching a generic version of Delzicol, a product that is nearly identical to Asacol, "as soon as it was introduced."[45]

---

[45] Teva Pharmaceuticals USA, Inc.'s Answer to Complaint and Counterclaims at 21, Warner Chilcott (US) LLC v. Teva Pharmaceuticals USA, Inc., No. 15 Civ. 1471 (E.D. Tex. November 2, 2015).

138.     But for Warner Chilcott's unlawful scheme, at least one, but likely several, generic manufacturers would have introduced generic Asacol into the U.S. market shortly after patent expiration in July 2013.

139.     Upon the launch of the first generic version of Asacol in 2013, Lupin would have immediately launched an authorized generic version of Asacol, further increasing the number of generic competitors in the market. On or about October 14, 2010, Lupin Limited announced that it had reached an agreement with Warner Chilcott plc and its U.S. subsidiary, Warner Chilcott Company, LLC, to settle then outstanding patent litigation regarding two Warner Chilcott products, Loestrin 24 Fe and Femcon Fe. As part of the settlement, Warner Chilcott agreed that it would allow Lupin to purchase and dispense an authorized generic version of Asacol if a generic version of the drug was introduced by a third party in the United States. This term of the settlement evidences Lupin Limited's expectation that a generic version of Asacol would be introduced by a third party in subsequent years.

### D.     Warner Chilcott's Switch Made Financial Sense only if it Harmed Competition

140.     As intended, Warner Chilcott's tactics succeeded in excluding would-be generic competitors from their only practical means of distributing their products – by using state substitution laws.

141.     Warner Chilcott's exclusionary motive is illustrated by its willingness to sacrifice profits as part of its anticompetitive scheme. Its decisions to incur the extra costs (and suffer the revenue losses) associated with the change in Asacol dosage form from Asacol tablets to Asacol HD tablets and Delzicol capsules were economically rational only because those changes had the exclusionary effect of impairing generic competition. But for the impact on generic competition,

Warner Chilcott would not have invested the resources necessary to reformulate and cannibalize

Asacol tablets, because doing so would have been economically irrational.

142.     In communications with its shareholders, Warner Chilcott stated that it was losing

sales as a result of the unlawful product hop:

> Net sales of ASACOL were $140 million in the quarter ended June
> 30, 2013, a decrease of $47 million, or 25%, compared to the prior
> year quarter. ASACOL net sales in North America totaled $128
> million and $175 million in the quarters ended June 30, 2013 and
> 2012, respectively, including net sales in the United States of $122
> million and $169 million in the quarters ended June 30, 2013 and
> 2012, respectively. **The decrease in ASACOL net sales in the
> United States in the quarter ended June 30, 2013 as compared
> to the prior year quarter was due primarily to our decision to
> cease trade shipments of ASACOL 400 mg in the United States
> as we transitioned from ASACOL 400 mg to DELZICOL in
> March 2013, offset, in part, by an increase in net sales of
> ASACOL HD (800 mg).**
> ...
> We expect that the loss of ASACOL 400 mg net sales in the
> United States will be offset, in part, by net sales of DELZICOL
> and increased net sales of ASACOL HD (800 mg).[46]

143.     Similarly, at its 2014 Investor Meeting, Actavis (now Allergan), the then-owner

of the Asacol franchise, highlighted that the company experienced a loss of sales due to the

product hop from Asacol to Asacol HD and Delzicol:[47]

---

[46]     *Warner Chilcott Reports Operating Results for the Quarter Ended June 30, 2013*, *available at*
http://globenewswire.com/news-release/2013/07/24/562160/10041663/en/Warner-Chilcott-Reports-Operating-
Results-for-the-Quarter-Ended-June-30-2013.html (emphasis added).
[47]     *2014 Investor Meeting presentation*, *available at* http://phx.corporate-ir.net/External.File?t=1&item=VHlw
ZT0yfFBhcmVudElEPTUwODA3NDh8Q2hpbGGRJRD01MzEyNjY=.



If Warner Chilcott's product hop did not have the effect of impairing generic competition, the hop would have been a money-losing proposition. The product hop made economic sense for Warner Chilcott solely because the hop impaired generic competition. Warner Chilcott's investments in reformulating and cannibalizing the sales of Asacol were not investments in improving products and helping patients; they were investments in impairing competition.

### E.     Warner Chilcott Fraudulently Lists the '180 Patent in the Orange Book for Delzicol

144.    Warner Chilcott's putting the unnecessary capsule around Asacol not only prevented generic Asacol from being substitutable for Delzicol, it also created the pretext for Warner Chilcott to further abuse the regulatory process by fraudulently listing a new patent in the Orange Book and then commencing sham patent litigation and obtaining an automatic 30-month stay on competition from generic Delzicol.

145.    U.S. Patent No. 6,649,180 ("the '180 patent") covers a cellulose capsule having a specific formulation that is set forth in the claims and expires April 13, 2020. Warner Chilcott

purports to have obtained an exclusive license to manufacture Delzicol under the '180 patent.
The U.S. Patent and Trademark Office originally published the '180 cellulose capsule patent on
November 18, 2003. The '180 patent claims a "hard capsule formed of a film composition
comprising a hydroxypropyl methyl cellulose as a base, a gelling agent, and a gelling aid . . ."

146.    The patent itself states that "[t]he gelling agent used may be selected from among,
for example, carrageenan, tamarind seed polysaccharide, pectin, curdlan, furcellaran, gellan gum,
and mixtures thereof." The label of Delzicol demonstrates that it does not include any of these
identified "gelling agents." Further, the patent states "[a]s the gelling aid used herein, any
substance that can promote gelation by the gelling agent may be employed." Given that Delzicol
does not include any of the identified gelling agents set forth in the patent, it also does not
include "any substance that can promote gelation by the gelling agent."

147.    Nevertheless, as part of its anticompetitive scheme Warner Chilcott improperly
listed the '180 patent in the Patent and Exclusivity Information for NDA No. 204412 in the
Orange Book, falsely asserting that the patent covers the Delzicol drug product.

148.    The FDA does not examine the validity of Orange Book patent submissions, but
instead lists in the Orange Book any patents that the NDA-holder claims cover its drug.

149.    As part of the process for approving Delzicol NDA No. 204412, the FDA's
Center for Drug Evaluation and Research conducted a clinical pharmacology and
biopharmaceutics review, which included a multipoint dissolution profile comparison between
Delzicol mesalamine delayed-release capsules, 400 mg, and Asacol mesalamine delayed-release
tablets, 400 mg (which did not include a capsule), over a range of pH values, and concluded that
the dissolution profiles between the two products are similar over a range of pH values.
Therefore, encapsulating the enteric-coated tablet in the Delzicol NDA No. 204412 product has

no effect on the pH dependency compared to the enteric-coated Asacol mesalamine delayed-release tablets.

150.     Warner Chilcott's listing of the '180 patent in the Orange Book was a sham in that Delzicol as an allegedly new product was fraudulent and implemented solely and exclusively to impair and delay competition from less expensive generic versions. Warner Chilcott gamed the regulatory system so that if any generic manufacturer desired to market generic Delzicol, it had to submit an ANDA to the FDA certifying either that its product would not be marketed in the until expiration of the listed patent (paragraph III certification) or that each listed patent was invalid or would not be infringed by the proposed product (paragraph IV certification).

151.     As noted in detail below, Warner Chilcott's sham patent listing served as the regulatory predicate for it to fraudulently obtain up to 30 months of protection from generic competition by filing sham lawsuits alleging infringement of the improperly listed patent to further its fraudulent scheme to eliminate competition from generic Asacol. Warner Chilcott did not list the '180 patent in the Orange Book as part of a legitimate attempt to protect a legitimate product.

**F.     Warner Chilcott Files and Maintains Fraudulent Patent Litigation Against Teva to Obtain an Automatic 30-Month Stay of Generic Entry**

152.     On or about July 16, 2015, Teva Pharmaceuticals USA, Inc. ("Teva"), a generic drug manufacturer, submitted ANDA No. 207873 to the FDA, seeking to market a generic equivalent of Delzicol. This ANDA contained a Paragraph IV certification to the '180 patent. On or about that same day, Teva sent to Warner Chilcott a Notice Letter as required by the FDCA.

153.     Teva attached to its July 16, 2015 letter a detailed statement of the factual and legal bases for Teva's ANDA certifications for the Orange Book-listed '180 patent pursuant to

21 U.S.C. § 355(j)(2)(B)(ii) and an offer of confidential access to relevant portions of Teva's

ANDA No. 207873 pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III).

154.    On August 14, 2015, Teva, through its counsel, made available to Warner

Chilcott's counsel and experts relevant portions of ANDA No. 207873, which establish that the

proposed mesalamine delayed-release capsules, 400 mg, for which Teva is seeking FDA

approval will not infringe any valid and enforceable claim of the '180 patent.

155.    The '180 patent claims a very narrow invention with one independent claim

reciting a specific formulation for a hard capsule using an HPMC film base with a specific

content of methoxyl and hydroxypropoxyl groups. The '180 patent does not, and cannot, claim

every HPMC capsule. In fact, other prior art patents disclose HPMC capsules having a gelling

agent and a gelling aid. *See, e.g.*, U.S. Patent No. 5,756,123 (claim "[a] capsule shell comprising

79.6 to 98.7% by weight of a hydroxypropylmethyl cellulose, 0.03 to 0.5% by weight of

carrageenan [identified in the '180 patent as a gelling agent], and 0.14 to 3.19% by weight of a

potassium ion and/or a calcium ion [identified in the '180 patent as a gelling aid] . . ."). The

formulation claimed in the '180 patent is not novel and non-obvious in view of such prior art,

which renders any patent infringement litigation baseless.

156.    Moreover, other HPMC capsules have been marketed since the 1980s as an

alternative to gelatin capsules containing animal byproducts. There are at least 6 HPMC capsules

approved for usage by the FDA, and likely other alternative capsules that could be developed and

approved by the FDA. Because the capsule offers no therapeutic or pharmacokinetic benefit to

the patient, any of these other noninfringing HPMC capsules could be used by generic

manufacturers without infringing the '180 patent.

157. Despite actual knowledge of the noninfringement, on August 31, 2015, Warner Chilcott filed a patent infringement suit against Teva in the United States District Court for the District of Delaware.[48] As Warner Chilcott intended when it listed the '180 patent in the Orange Book, this patent infringement action triggered an automatic 30-month stay of final approval of Teva's ANDA. Teva cannot receive final approval to market its product until it either prevails in the patent infringement suit, or the expiration of thirty months, whichever occurs first. Thus, the mere filing of the patent lawsuit – even though it was meritless – prevented a generic form of Delzicol from entering the market, thereby fraudulently extending Warner Chilcott's monopoly.

158. Warner Chilcott's patent lawsuit against Teva is a sham because (1) Warner Chilcott knew that Teva's product does not infringe any valid claim of the patent, and (2) Warner Chilcott brought and is maintaining the lawsuit solely in order to obtain the advantage of the 30-month stay based on its having fraudulently listed the '180 patent in the Orange Book.

159. As alleged above, Warner Chilcott does not have any good faith factual basis to allege that the proposed product described in Teva's ANDA No. 207873 infringes any claim of the '180 patent, and nevertheless filed and is continuing to maintain the lawsuit.

160. Warner Chilcott filed the patent lawsuit against Teva without regard to the merits of the infringement claims and instead did so for the purpose of delaying Teva's entry into the marketplace by, *inter alia*, burdening Teva with litigation costs and making baseless accusations of infringement causing the approval of Teva's ANDA No. 207873 by the FDA to be stayed.

---

[48]    15-cv-00761-UNA.

161.     Warner Chilcott's actions amount to an impermissible attempt to prolong the life of its long-standing patent monopoly over its Asacol franchise, including extending the monopoly provided to Warner Chilcott by patents that have already expired.

162.     By suing Teva under the Hatch-Waxman Act, Warner Chilcott obtained a 30-monty stay of FDA approval of generic Delzicol capsules.

163.     Without its sham Orange Book listing of the '180 patent, Warner Chilcott could not have automatically stayed FDA approval of generic Delzicol. Since its lawsuit against Teva is predicated on a fraudulent Orange Book listing, its procurement of the 30-month stay is a result of such fraud.

164.     Warner Chilcott asserted the frivolous infringement claims in bad faith and with fraudulent purpose – for example, to fraudulently obtain a 30-month stay of FDA approval of ANDA No. 207873 – thus forcing Teva to undertake the expense of defending the lawsuit and delaying the entry to market of a lower-cost, generic version of Delzicol.

165.     Warner Chilcott has thus wielded the '180 patent as an anticompetitive weapon beyond its permissible physical or temporal scope in order to consolidate, entrench, and enhance Warner Chilcott's monopoly and to impair generic competition.

### G.     Warner Chilcott Files and Maintains Fraudulent Patent Litigation Against Mylan to Obtain an Automatic 30-Month Stay of Generic Entry

166.     On or about September 28, 2015, Mylan Pharmaceuticals, Inc. ("Mylan"), a generic drug manufacturer, submitted ANDA 207826 to the FDA, seeking approval to market a generic version of Delzicol in the United States. This ANDA also contained a Paragraph IV certification to the '180 patent. That same day, Mylan sent the required Notice Letter to Warner Chilcott.

167.     On November 9, 2015, Warner Chilcott filed a sham patent suit against Mylan in the Eastern District of Texas. 2:15-cv-01740, claiming infringement of the improperly listed '180 patent. As with the Teva litigation, Warner Chilcott commenced this lawsuit even though it was (1) objectively baseless, in that no reasonable litigant could ultimately expect success on the merits; and (2) motivated by a desire to impose injury on Mylan, a potential competitor and to obtain the automatic 30-month stay predicated on a sham Orange Book listing, rather than to obtain legal relief.

168.     As described in Paragraphs 144-165 above, Warner Chilcott does not have any good faith factual basis to allege that the proposed product described in Mylan's ANDA infringes any claim of the '180 patent, and nevertheless filed and is continuing to maintain the lawsuit.

169.     Warner Chilcott filed the patent lawsuit against Mylan without regard to the merits of the infringement claims and instead did so for the purpose of delaying Mylan's entry into the marketplace by, *inter alia*, burdening Mylan with litigation costs and making baseless accusations of infringement causing the approval of Mylan's ANDA by the FDA to be stayed.

170.     Warner Chilcott's actions amount to an impermissible attempt to prolong the life of its long-standing patent monopoly over its Asacol franchise, including extending the monopoly provided to Warner Chilcott by patents that have already expired.

171.     Without its sham Orange Book listing of the '180 patent, Warner Chilcott could not have automatically stayed FDA approval of generic Delzicol. Since its lawsuit against Mylan is predicated on a fraudulent Orange Book listing, its procurement of the 30-month stay is a result of such fraud.

172.     Warner Chilcott asserted the frivolous infringement claims in bad faith and with improper purpose – for example, to fraudulently obtain a 30-month stay of any FDA approval of Mylan's ANDA – thus forcing Mylan to undertake the expense of defending the lawsuit and delaying the entry to market of a lower-cost, generic version of Delzicol.

173.     Warner Chilcott has thus wielded the '180 patent as an anticompetitive weapon beyond its permissible physical or temporal scope in order to consolidate, entrench, and enhance Warner Chilcott's monopoly and to impair generic competition.

## VI.     EFFECT OF THE SCHEME ON COMPETITION AND DAMAGES TO PLAINTIFF AND THE CLASS

174.     On October 1, 2013, Allergan plc (then "Actavis") acquired Warner Chilcott plc and became the successor in interest to Asacol, Asacol HD, and Delzicol.

175.     Warner Chilcott's extensive generic impairment efforts have proven beneficial for Allergan. Allergan continues to sell Asacol HD and Delzicol in the United States. Allergan sold approximately $550 million of the two products in 2014. This is hundreds of millions more in sales than Allergan would have achieved absent Warner Chilcott's unlawful scheme to impair generic competition. Generic Asacol products would have been priced at a fraction of the cost of brand Asacol HD and Delzicol.

176.     Warner Chilcott's (and later Allergan's) overarching anticompetitive scheme impaired and delayed the sale of generic Asacol products in the United States, and unlawfully and/or fraudulently enabled Warner Chilcott (and later Allergan) to sell its branded Asacol and Delzicol products at artificially inflated prices. But for Warner Chilcott's (and later Allergan's) unlawful and fraudulent conduct, generic competitors would have been able to compete, unimpeded, with generic versions of Asacol products.

177.    But for Defendants' anticompetitive conduct, as alleged above, manufacturers of generic Asacol tablets would have entered the marketplace and effectively competed with Warner Chilcott no later than July 31, 2013, when the '170 and '171 patents expired, without Warner Chilcott's having switched the market to Asacol HD and Delzicol. As a result, but for Defendants' anticompetitive conduct, Plaintiff and other members of the Class would have: (1) purchased lower-priced generic Asacol (400 mg) tablets instead of the higher-priced brand Asacol HD and Delzicol capsules for some or all of their Asacol Franchise Product requirements; (2) paid a lower price for their generic Asacol Franchise Products, sooner; and/or (3) paid lower prices for some or all of their remaining brand purchases.

178.    Had Warner Chilcott not reformulated and cannibalized Asacol pursuant to the anticompetitive scheme, when generic Asacol tablets entered the market they would have been automatically substitutable for most (if not all) of the units of brand Asacol, and all, or virtually all, of Warner Chilcott's annual sales of Asacol at that time would have been in 400 mg tablet form. Within months, generic tablets would have captured almost all sales at vastly lower prices, delivering substantial savings to Plaintiff and other purchasers. As a result of Warner Chilcott's anticompetitive scheme, however, competition from generic manufacturers has been very significantly impaired.

179.    During the relevant period, Plaintiff and other purchasers bought substantial amounts of Asacol HD and Delzicol. As a result of Warner Chilcott's (and later Allergan's) unlawful and fraudulent conduct as alleged herein, Plaintiff and other purchasers were compelled to pay, and did pay, artificially inflated prices for their Asacol HD and Delzicol product requirements. Plaintiff and the other purchasers paid prices for Asacol HD and Delzicol that

were substantially greater than the prices that they would have paid absent the unlawful and fraudulent conduct alleged herein.

180.    As a consequence, Plaintiff and other purchasers have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## VII.    CLASS ACTION ALLEGATIONS

181.    Plaintiff brings this action in its own right and on behalf of all other similarly situated persons and entities under Fed. R. Civ. P. Rules 23(a) and (b)(3), as defined below.

182.    **The Class**

> All persons or entities in the United States and its territories that purchased Asacol HD, Delzicol, and/or generic Asacol HD in any form directly from Warner Chilcott, Allergan, or Zydus, including any predecessor or successor of Warner Chilcott or Allergan, at any time between July 31, 2013 until the anticompetitive effects of Warner Chilcott and Allergan's conduct cease.

183.    Excluded from the Class are Warner Chilcott, Allergan, and any officers, directors, management, employees, subsidiaries, and affiliates and all federal governmental entities.

184.    Members of the Class are so numerous that joinder is impracticable. Further, the Class is readily identifiable from information and records in the Defendants' possession.

185.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants. Class members paid artificially inflated prices for brand Asacol HD and Delzicol formulations as a result of Defendants' unlawful and fraudulent conduct and were deprived of the opportunity to purchase less-expensive generic drugs.

186.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests coincide with those of the wider Class.

187.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

188.    Questions of law and fact common to the members of the Class predominate over questions that affect individual class members because Defendants' conduct affected the entire class similarly.

189.    Questions of law and fact common to the Class include:

a.    Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic impairment scheme;

b.    Whether Defendants' anticompetitive scheme impaired market entry of generic Asacol drug products and impaired generic competition in the Asacol franchise;

c.    Whether Defendants' reformulation and cannibalization of Asacol was predatory and anticompetitive;

d.    Whether Defendants surrounded Asacol with a capsule for the anticompetitive purpose of impairing generic competition;

e.    Whether, regarding those parts of Defendants' conduct for which justifications may be offered, there were cognizable, non-pretextual, procompetitive justifications, which Defendants' conduct was the least restrictive means of achieving, that offset the harm to competition and consumers in the market in which Asacol is sold;

f.    Whether direct proof of Defendants' monopoly power is available, and if available, whether it is sufficient to prove Defendants' monopoly power without the need to also define a relevant market;

g.    If markets need to be defined, what they are;

h.    Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

i.    Whether Defendants' scheme, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class; and

j.   The quantum of overcharges paid by the Class in the aggregate.

190.   Proceeding on a classwide basis is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expenses that individual actions would entail. Class treatment will allow injured persons and entities to seek compensation for injuries when it would not be practical for them to do so individually. These benefits substantially outweigh any difficulties that may arise out of class treatment.

191.   Plaintiff does not know of any legitimate reason that this action cannot be pursued as a class action.

## VIII.   EFFECT ON INTERSTATE COMMERCE

192.   Defendants sold Asacol, and sold, sell and will sell Asacol HD and Delzicol, across state lines at all relevant times.

193.   Contracts, bills, and other forms of business communications pertaining to Asacol, Asacol HD, and Delzicol were transmitted in a continuous and uninterrupted flow across state lines in the exchange of interstate commerce.

194.   Various instrumentalities were used to effectuate the unlawful acts alleged herein, including United States mail, interstate and foreign travel, and interstate and foreign telephone commerce during all relevant times. The Defendants' activities, as alleged in this Complaint, have substantially affected interstate commerce.

## IX.   MARKET POWER

195.   At all relevant times Warner Chilcott and Allergan had monopoly power in the market for Asacol, Asacol HD, and Delzicol and their generic equivalents (hereafter "Asacol

Franchise Drugs") and narrower markets therein, because they had the power to raise or maintain the price of Asacol Franchise Drugs at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

196.    Warner Chilcott and Allergan had the ability to control the prices of Asacol Franchise Drugs and exclude relevant competitors. Direct evidence demonstrates that: (a) generic versions of each drug would have entered the market at substantial discounts to the brands but for the Defendants' anticompetitive conduct; (b) the gross margin on each drug was at all times at least 60%; and (c) Defendants never lowered the price of the drugs to the competitive level in response to the pricing of other branded or generic drugs.

197.    To the extent that Plaintiff is required to prove monopoly power by defining a relevant product market, Plaintiff alleges that the relevant product market is the market for Asacol Franchise Drugs and narrower markets therein.

198.    A small but significant, non-transitory price increase in the price of Asacol Franchise Drugs did not cause a significant loss of sales. At competitive prices, Asacol Franchise Drugs do not exhibit significant, positive, cross-elasticity of demand with respect to price with any other mesalamine formulations or treatments for ulcerative colitis other than AB-rated generic versions of those Asacol Franchise Drugs.

199.    Defendants needed to control only Asacol Franchise Drugs and their AB-rated generic equivalents, and no other products, in order to maintain the price of the products profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Asacol Franchise Drugs would render Defendants unable to profitably maintain supracompetitive prices for those products.

200.    Defendants sold branded Asacol Franchise Products in excess of marginal costs, and in excess of the competitive price, and enjoyed unusually high profit margins.

201.    The United States and its territories constitute the relevant geographic market.

202.    At all relevant times, Defendants enjoyed high barriers to entry with respect to the above-defined relevant market due to patent protection, the high cost of entry and expansion, expenditures in marketing and physician detailing, and AB-rated generic substitution laws.

203.    Defendants' market share in the relevant markets was and remains 100%.

## X.    CLAIMS FOR RELIEF

### Count I
### Monopolization (15 U.S.C. § 2)

204.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

205.    At all relevant times, Defendants possessed substantial market power (i.e. monopoly power) in the relevant market. Defendants possessed the power to raise and maintain supracompetitive prices and exclude competitors from the relevant market.

206.    Defendants perpetrated an anticompetitive scheme which included, cumulatively and in the alternative, unlawfully and/or fraudulently:

    a.  Refusing to reformulate Asacol simply by removing DBP and replacing with DBS, and instead adding a bogus capsule, the purpose of which was to render generic Asacol tablets non-substitutable;

    b.  Withdrawing Asacol tablets from the market rather than reformulating them to remove DBP and replace it with DBS;

    c.  Cannibalizing the sales of Asacol;

    d.  Bribing doctors to switch prescriptions from Asacol to Asacol HD;

e.  Switching prescriptions from Asacol to Asacol HD by promoting the latter for off-label uses;

f.  Sham listing of the '180 patent in the Orange Book;

g.  Commencing and maintaining fraudulent patent litigation against Teva;

h.  Commencing and maintaining fraudulent patent litigation against Mylan;

i.  Allocating 100% of the Asacol franchise market to Allergan;

j.  Effectively fixing the price that Plaintiff and members of the Class would pay for Asacol Franchise Products and generic equivalents at supracompetitive levels.

207.   Through the anticompetitive scheme described above, Defendants willfully maintained and continue to maintain monopoly power in the relevant market using restrictive and exclusionary conduct, rather than by providing better products or services, and thereby injured Plaintiff and members of the Class. Specifically, by denying Plaintiff and members of the Class the opportunity to purchase Asacol, Asacol HD, and Delzicol at a substantial discount via generic substitutes, Defendants willfully maintained their monopoly over (and supracompetitive profits in) the relevant market.

208.   Defendants' conscious objective was and is to continue its dominance of the relevant market by and through the anticompetitive scheme described above.

209.   Defendants' anticompetitive scheme harmed competition and purchasers as alleged above.

210.   There are no non-pretextual procompetitive justifications for Defendants' conduct. Even if there were such a conceivable justification, the anticompetitive effects of Defendants' conduct far outweigh any conceivable justification. Further, the anticompetitive scheme was far broader than necessary to achieve any conceivable procompetitive benefit.

211.    Defendants' anticompetitive scheme was the direct and proximate cause of the injuries to Plaintiff and the Class, as described herein.

212.    Plaintiff and the members of the Class have been injured in their business or property as a direct and proximate result of Defendants' anticompetitive conduct. The injuries include: (1) being denied the opportunity to purchase lower-priced generic Asacol, Asacol HD, Delzicol; and (2) being forced to purchase a more expensive branded Asacol HD, and Delzicol. These injuries are the type that the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

213.    Plaintiff and the Class seek damages and treble damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

214.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and Class members.

## Count II
## Attempt to Monopolize (15 U.S.C. § 2)

215.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

216.    Defendants possessed substantial market power (i.e., monopoly power) in the relevant market. Defendants possessed the power to raise prices, maintain prices, and exclude competitors from the relevant market.

217.    Through the totality of the scheme described above, Defendants willfully maintained and continue to maintain monopoly power in the relevant market using restrictive and exclusionary conduct, rather than by providing better products or services, and thereby injured Plaintiff and members of the Class.

218.     At all relevant times, Defendants had a specific intent to achieve or maintain a monopoly in the relevant market.

219.     Defendants' actions were intended to suppress rather than to promote competition on the merits and have had precisely the intended effect.

220.     Plaintiff and the members of the Class have been injured in their business or property as a direct and proximate result of Defendants' unlawful attempted monopolization. These injuries are the type that the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

221.     Plaintiff and the Class seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

222.     Defendants are jointly and severally liable for all damages suffered by Plaintiff and Class members.

## XI.     DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that the Court:

    a.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare the Plaintiff as the representative of the Class;

    b.   Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

    c.   Award the Class damages (i.e., three times overcharges) in an amount to be determined at trial;

    d.   Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

e. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.   JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiff on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Dated: June 29, 2016

Respectfully submitted,

Bruce E. Gerstein
(Attorney Bar Code #2726)

**GARWIN GERSTEIN & FISHER LLP**
Bruce E. Gerstein
Joseph Opper
Dan Litvin
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com

**SMITH SEGURA & RAPHAEL, LLP**
David C. Raphael, Jr.
Erin R. Leger
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com

**ODOM & DES ROCHES, L.L.P.**
Stuart E. Des Roches
Andrew W. Kelly
650 Poydras Street, Suite 2020

New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com

**HEIM PAYNE & CHORUSH, LLP**
Russ Chorush
Miranda Jones
600 Travis, Suite 6710
Houston, TX  77002
Tel:  (713) 221-2000
Fax:  (713) 221-2021
rchorush@hpcllp.com

*Counsel for Value Drug Company and the
Proposed Class*